## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| IDLEAIRE TECHNOLOGIES | ) Case No. 08-10960(KG) |
| CORPORATION, | ) |
| | ) |
| Debtor. | ) |
| _____ | ) |
| WAUSAU BUSINESS INSURANCE COMPANY | ) |
| and EMPLOYERS INSURANCE OF WAUSAU | ) |
| COMPANY, | ) |
| | ) |
| Plaintiffs/Counterclaim Defendants, | ) Adv. Pro. No. 08-51227 (KG) |
| | ) |
| v. | ) |
| | ) |
| IDLEAIRE TECHNOLOGIES CORPORATION, | ) |
| | ) |
| DEBTOR/DEFENDANT, | ) |
| Counterclaim Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| NANCY YOUNGER and | ) |
| ESTATE OF WILLIAM YOUNGER, | ) |
| | ) |
| Claimants/Youngers/Defendants | ) **Re: Dkt No. 170** |
| _____ | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

In the adversary proceeding which this post-trial decision addresses, the issue

presented is whether Debtor's insurance coverage is available to compensate third parties,

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

i.e., customers, for harm alleged to have resulted from the use of Debtor's product, or whether the insurer has valid coverage defenses.  In the one day trial, the parties presented evidence addressing the Debtor's alleged breaches of the insurance policies, namely, giving late notice and violating the cooperation provisions of the policies.  The Court finds in favor of the defendants, the injured parties, on the bases of the findings of fact and conclusions of law herein.

## FINDINGS OF FACT

A.   **Procedural History**

1.      On or about April 30, 2008, the claimants/defendants Nancy Younger and the Estate of William Younger (collectively, the "Youngers") filed a wrongful death/personal injury action against defendant/debtor IdleAire Technologies Corporation ("IdleAire" or the "Debtor") in the Circuit Court for Knox County, Tennessee (the "Liability Action").

2.      In the Complaint filed in the Liability Action, the Youngers assert causes of action against Debtor for strict product liability, negligent failure to warn, breach of express and implied warranties and negligence, and they seek $18 million in compensatory damages, discretionary costs and attorney's fees.[2]

---

[2] The factual allegations in the Youngers' Complaint in the Liability Action are discussed *infra*.  To be clear, the Court is not addressing or deciding issues relating to liability, which the Liability Action will determine.  Any findings which touch upon liability are inadvertent surplusage and not relevant to the issues before the Court.

3.      On May 12, 2008, Debtor filed a Chapter 11 Voluntary Petition in this Court, which stayed the Liability Action pursuant to 11 U.S.C. § 362(a).

4.      Plaintiffs Wausau Business Insurance Company and Employers Insurance of Wausau Company (collectively "Wausau") initiated this adversary proceeding against Debtor and the Youngers seeking a declaratory judgment that no coverage exists for Debtor under certain commercial general liability and excess/umbrella policies issued to Debtor by Wausau (collectively, the "Policies") for any judgment that might be entered against Debtor in the Liability Action.

5.      On October 27, 2008, Wausau filed a motion for summary judgment in this adversary proceeding in which it sought entry of a final judgment against the Youngers (who are the assignees of Debtor's rights under the Policies) and, in support thereof, contended that coverage for the Youngers' claims was:  (i) excluded by certain pollution exclusion endorsements in the Policies and (ii) unavailable due to certain alleged breaches by IdleAire of the Policies' post-loss conditions regarding notice and cooperation.

6.      The Youngers opposed Wausau's motion for summary judgment and filed a cross-motion for summary judgment, arguing that the pollution exclusions did not bar coverage and that issues of fact existed as to the post-loss conditions so as to prevent summary judgment.

7.      By Order, dated February 18, 2009, the Court granted summary judgment in favor of the Youngers, ruling that the pollution exclusions were inapplicable, and denying

3

Wausau's motion for summary judgment as to the alleged breaches of post-loss conditions due to the existence of disputed issues of fact. *In re Idleaire Technologies Corp.*, 2009 WL 413117 (Bankr. D. Del. 2009).

8.      On November 2, 2009, the Court held a bench trial as to the issues of fact surrounding the alleged breaches of post-loss conditions.

### The Insurance Policies

9.      Wausau issued to IdleAire Commercial Package Policy No. YYK-Z41-435246-027 (the "CGL Policy") with a policy period from January 1, 2007 to January 1, 2008.  Trial Exhibit ("Ex.") 1 (CGL Policy, Common Policy Declarations).

10.     The CGL Policy provides liability coverage on an occurrence basis, and has limits of $1 million per occurrence and $2 million in the aggregate, with a separate $2 million aggregate limit applicable to products-completed operations claims.  Ex. 1 (CGL Policy, Commercial General Liability Declarations, Occurrence).

11.     The CGL Policy's Insuring Agreement provides that Wausau "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Ex. 1 (CGL Policy, Section I(1)(a)).

12.     The CGL Policy's Insuring Agreement provides that Wausau "may, at [Wausau's] discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result."  Ex. 1 (CGL Policy, Section I(1)(a)).

13.    The CGL Policy's Insuring Agreement provides that:

        d.    "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

            (1)    Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

            (2)    Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

            (3)    Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

Ex. 1 (CGL Policy, Section I(1)(d)).

14.    Under the CGL Policy, an "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Ex. 1 (CGL Policy, Section V(13)).

15.    The CGL Policy, in its Express Liability Endorsement, provides under "Duties In The Event Of Occurrence, Offense, Claim Or Suit," that:

        a.    You, your insurance manager or any other person you designate must see to it that we, or our authorized agents, are notified as soon as reasonably possible of an "occurrence" or

offense which may result in a claim.  Notice should include:

    (1)    How, when and where the "occurrence" or   offense took place;

    (2)    The names and addresses of any injured persons and witnesses; and

    (3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

Knowledge of an "occurrence" or offense by your agent, servant or "employee" is not considered knowledge by you unless your insurance manager or other designated person has received notice from your agent, servant or "employee."

Ex. 1 (CGL Policy, Express Liability Endorsement, Section (3)(2)(a)).

16.    The CGL Policy, in its Express Liability Endorsement, provides under "Duties

In The Event Of Occurrence, Offense, Claim Or Suit," that:

    b.    If a claim is made or "suit" is brought against any insured, you must:

    (1)    Immediately record the specifics of the claim or "suit" and the date received; and

    (2)    Notify us as soon as reasonably possible.

Ex. 1 (CGL Policy, Express Liability Endorsement, Section (3)(2)(b)).

6

17.    The CGL Policy, in its Express Liability Endorsement, provides under "Duties In The Event Of Occurrence, Offense, Claim Or Suit," that:

    c.    You and any other involved insured must:

        (1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

        (2)    Authorize us to obtain records and other information;

        (3)    Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

        (4)    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

Ex. 1 (CGL Policy, Express Liability Endorsement, Section (3)(2)(c)).

18.    The CGL Policy, in its Express Liability Endorsement, provides under "Duties In The Event Of Occurrence, Offense, Claim Or Suit," that:

    d.    No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

Ex. 1 (CGL Policy, Express Liability Endorsement, Section (3)(2)(d)).

19.    Employers Insurance of Wausau Company issued to IdleAire Excess/Umbrella Commercial Liability Policy No. THC-Z41-435246-057 (the "Excess/Umbrella Policy") with

a policy period from January 1, 2007 to January 1, 2008.  Ex. 2 (Excess/Umbrella Policy,

Common Policy Declarations).

20.     The Excess/Umbrella Policy provides Excess Follow Form Liability coverage

under Coverage A, and has limits of $10 million per occurrence and in the aggregate.  Ex.

2 (Excess/Umbrella Policy, Commercial Liability Declarations & Quick Reference).

21.     The Excess/Umbrella Policy contains the same definitions for "bodily injury"

and "occurrence" that the CGL Policy contains. Ex. 2 (Excess/Umbrella Policy, Section VII)

("Definitions for Coverage A follow the definitions in "scheduled underlying insurance"

unless otherwise stated within this section."); Ex. 2 (Excess/Umbrella Policy, Section VII(Q))

(stating that "occurrence" has the meaning defined in "scheduled underlying insurance" with

respect to "bodily injury" and "property damage" under "Coverage A").

22.     The Excess/Umbrella Policy provides that:

> "Bodily injury" or "property damage" is known at the earliest time that an insured, its agent or employee, who has actual or implied authority to give or receive notice of an "occurrence", claim, "suit" or "loss":
>
> a.     Reports all or part of the "occurrence", claim, or "suit" to us or any other insurer;
> b.     Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or
> c.     Becomes aware by any other means that "bodily injury" or "property damage" which may result in a

8

> > "loss" covered by this policy has
> > occurred or begun to occur.

Ex. 2 (Excess/Umbrella Policy, Section (I)(C)(1)).

23.    In a section of the Excess/Umbrella Policy entitled "Conditions," the policy provides that "[w]e have no duty to provide coverage under this policy unless you and all other insureds have complied with all of the terms and conditions of this policy."  Ex. 2 (Excess/Umbrella Policy, Section V(F)).

24.    The Excess/Umbrella Policy provides, under "Duties In The Event Of An Occurrence, Claim Or Suit," that:

> 1.  We must be notified as soon as practicable of an "occurrence" that may result in a claim or "suit" under this policy.  To the extent possible, notice should include:
>     (1)    How, when and where the "occurrence" took place;
>     (2)    The names and addresses of any injured persons and any witnesses; and
>     (3)    The nature and location of any injury or damage arising out of the "occurrence".

Ex. 2 Excess/Umbrella Policy, Section V(G)(1)).

25.    The Excess/Umbrella Policy provides, under "Duties In The Event Of An Occurrence, Claim Or Suit," that:

> 2.    If a claim is made or "suit" is brought against any insured, which is reasonably likely to involve this policy, you must notify us in writing as soon as practicable.

Ex. 2 (Excess/Umbrella Policy, Section V(G)(2)).

26.    The Excess/Umbrella Policy provides, under "Duties In The Event Of An Occurrence, Claim Or Suit," that:

> 3.    You and all other insureds must:
>
> a.    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
>
> b.    Authorize us to obtain records and other information;
>
> c.    Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and
>
> d.    Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

Ex. 2 (Excess/Umbrella Policy, Section V(G)(3)).

27.     The Excess/Umbrella Policy provides, under "Duties In The Event Of An Occurrence, Claim Or Suit," that:

> 4.  No insured will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

Ex. 2 Excess/Umbrella Policy, Section V(G)(4)).

**B.     The Underlying Incident - IdleAire's Response**

28.     The incident (the "Incident") that ultimately gave rise to the Youngers' wrongful death/personal injury claims against Debtor occurred during the night of July 11-12, 2007, at a truck stop in Knoxville, Tennessee. Trial Transcript, (D.I. 170) page 70 (hereinafter referred to as "Tr" followed by the page number).

29.     At the time, the Youngers, who were long-haul truckers, had parked their truck at one of IdleAire's stations[3] in the truck stop and hooked it up to an IdleAire HVAC unit, which was designed to heat and cool the truck with an internal circulating system during rest and overnight stops to avoid having to keep the truck's engine idling in order to use the truck's own heating and cooling systems.  Tr 71.

---

[3]  The IdleAire system consisted of supported steel trusses under which tractor-trailers parked, with 12 inch diameter flexible hoses running from the trusses.  The hoses were attached to specially designed inserts placed in a truck cab's window opening.  When the trucker parked below one of the trusses in an equipped parking space, inserted a service module into a specially designed window adapter and opened the module at the end of the hose, he or she had available heating, air conditioning, high speed internet, satellite television, movies on demand, telephone service, training videos and electrical outlets, all of which ran from an in-ground source, through the trusses and the hoses to the cab.  Declaration of Michael C. Crabtree in support of First Day Motions and Applications (D.I. 3 - Main Case).

11

30.     A few days after the Incident, Mrs. Younger called Thomas Badgett, IdleAire's Chief Information Officer, to discuss the Incident and to advise that she had called IdleAire's customer service a few times but did not feel she had received an acceptable response. Tr 70-71.

31.     Mr. Badgett already was familiar with the Youngers, as they had been IdleAire customers for some time and Mrs. Younger frequently called IdleAire with various complaints and issues. Tr 124-125.

32.     When Mrs. Younger spoke with Mr. Badgett a few days after the Incident, she told him that her husband and she had been exposed to carbon monoxide or diesel fumes, had felt very sick, and that she had to help Mr. Younger out of the cab. Tr 70-71, 73, 76.

33.     Mrs. Younger advised Mr. Badgett that both she and Mr. Younger had headaches for two days after the Incident, that Mr. Younger had suffered a "massive nosebleed" and that the Youngers had stopped at a St. Louis emergency room after the Incident because Mr. Younger was suffering from respiratory symptoms, which were diagnosed as sinusitis. Tr 71, 77, 161, 318.

34.     Mrs. Younger commented shortly after the Incident that her husband and she had been "asphyxiated" and "almost killed". Tr 81, 86. Younger reported to Mr. Badgett and Mr. Ramer that Mr. Younger had been diagnosed with sinusitis arising from the Incident, that the Youngers were getting better, and that they did not need their medical expenses paid or plan on making a claim against IdleAire. Tr 76-77, 161-162.

35.    The main concern Mrs. Younger expressed to Mr. Badgett, however, was her desire that IdleAire check the IdleAire unit at the Knoxville truck stop to determine what was wrong with it so that others would not have an experience similar to the Youngers. Tr 71.

36.    Mrs. Younger also spoke with IdleAire's then assistant general counsel, Claude Ramer, who had conversations with Mrs. Younger in the past and knew of other complaints and issues she had raised to IdleAire. Tr 124-125.

37.    As in her conversation with Mr. Badgett, Mrs. Younger advised Mr. Ramer of the entry of diesel fumes/carbon monoxide gas into the Youngers' truck cab and their interest in having IdleAire determine and eliminate the problem with the IdleAire unit. Tr 160-162.

38.    As a matter of customer relations, both Mr. Badgett and Mr. Ramer offered to have IdleAire pay for the medical expenses the Youngers incurred immediately after the Incident. Tr 77, 161.

39.    Mrs. Younger responded that the Youngers had taken care of their own medical bills and were not interested in having the bills paid by IdleAire or in making a claim; she was just focused on having IdleAire repair the IdleAire unit so that others, and particularly children who might be accompanying their parents during the summer months, would not suffer problems similar to those the Youngers had suffered. Tr 161-162.

40.    The final clause from the "Duties" provision of the Policies states, "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent," which, by its very terms,

does not prevent insureds (such as IdleAire) from making payments at their *own* expense. Tr Ex 1, Exhibit A, p 3. Both Mr. Merchant and Ms. Olson testified that this provision permits insureds to pay expenses at their own cost. Tr 222, 265.

41.     Although IdleAire offered to pay from its own pocket the Youngers' initial medical expenses as permitted by this provision, no such payments were ever made because the Youngers declined IdleAire's offers. Tr 77, 161-162, 318.

42.     It was arranged that Mr. Badgett would have IdleAire's engineers examine the IdleAire unit and that he would then call Mrs. Younger. Tr 75, 161-162.

43.     After IdleAire's engineering department conducted a test on the IdleAire unit using colored smoke to determine whether the unit could have drawn exhaust from an adjacent truck into the cab of the Youngers' truck, it was determined that the unit had warped, and that a gap had been created between the flange of the hook-up hose and the unit that would allow exhaust to enter the cab of the truck to which it was connected.  Tr 93, 96, 164.

44.     The IdleAire unit in question was one of an older series that IdleAire was in the process of replacing throughout the country with a newer model. Tr 89-90.

45.     Mr. Badgett called Mrs. Younger to report that it appeared that the flange that connects the air hose to the air conditioner had pulled loose, thereby allowing outdoor air/gases to get into the system. Tr 76.

14

46.     Mr. Badgett told Mrs. Younger that a directive had been issued to all IdleAire sites to inspect the flanges on the older units that had not yet been replaced to correct any similar conditions that might exist. Tr 76.

47.     Mr. Badgett again offered to pay any medical expenses the Youngers had then incurred, but Mrs. Younger declined, saying that Mr. Younger and she were doing better and were not interested in pursuing the matter further. Tr 77.

48.     When Mr. Badgett had this discussion with Mrs. Younger, neither he, other IdleAire personnel nor the Youngers thought that the Incident had caused the Youngers anything more than temporary symptoms or a passing illness. Tr 77-78, 161-162.

49.     IdleAire heard nothing further from the Youngers for some time. Tr 139, 162.

50.     In August of 2007,[4] Mr. Ramer received a call from a Knoxville attorney with whom he was familiar, Sidney Gilreath, who said that the Youngers had contacted him about a potential claim against IdleAire, that he was looking into the Incident and that he would inform Mr. Ramer if he decided to represent the Youngers.  Tr 108, 162-163.

51.     Mr. Gilreath told Mr. Ramer that he had some question about the Youngers and that they had conveyed to him a "big long story" that he did not entirely follow, and that he intended to determine whether they had any claim and then decide whether to represent them. Tr 110, 112. Mr. Gilreath said he would contact Mr. Ramer again if he determined there was a claim, but he never communicated with Mr. Ramer again. Tr 163.

---

[4]     Mr. Gilreath recalled making the call at the end of September 2007.  Tr 111.

52.    Because Mr. Gilreath never spoke with or wrote to Mr. Ramer again, Mr. Ramer called him in November or December 2007, at which point Mr. Gilreath reported that he had been told that his services were no longer requested and that the Youngers were consulting an attorney in Florida. Tr 163.

53.    Mr. Ramer did not hear about the Youngers again until January 2008, when he heard from the Youngers' present counsel, Don Russo, Esquire, who claimed that the Youngers had developed severe health problems and offered to provide medical records reflecting the Youngers' conditions.  Tr 167.

54.    Mr. Ramer first considered the Incident to constitute a claim against IdleAire when he received the January 2008 call from Mr. Russo, advising him that the Youngers were claiming that the Incident caused permanent, severe medical symptoms beyond transitory sinusitis and headaches.  Tr 175.

55.    Mr. Ramer first learned of an alleged carbon monoxide poisoning diagnosis when the Youngers' counsel provided it to him in January of 2008. Tr 180.  Mr. Ramer gave notice to Wausau on January 18, 2008.  Tr 179-180; Ex 49.

56.    During the last communications that IdleAire's representatives had with the Youngers, around the time of the Incident, Mrs. Younger told them that she was better and that her husband was getting better from the sinusitis diagnosed in the emergency room. Based on the information provided to it, IdleAire was under the impression that the total effect of the Incident was a brief matter and that because the Youngers refused

16

reimbursement from IdleAire for the costs of their medical treatment, Mr. Badgett and Mr. Ramer (who were the IdleAire representatives who had been in contact with Mrs. Younger) did not think of the matter as a liability claim and did not handle it as such.  Tr 48, 77.

57.    Evidence at trial established that IdleAire had standard procedures in place for notifying Wausau of liability claims. Tr 116-120,121.

58.    The Youngers' claim is not for the mild and transitory symptoms they suffered immediately after the Incident, but for far more serious delayed symptoms and long term adverse effects of carbon monoxide exposure, of which neither the Youngers nor IdleAire were aware when Mrs. Younger first called IdleAire. Tr 167.

59.    In January 2008, upon learning of the serious, long term injuries the Youngers were claiming, Mr. Ramer notified Wausau, in keeping with IdleAire's standard procedures for reporting liability claims. Tr 179-180; Ex 49.

C.    **Wausau's Response**

60.    After IdleAire provided notice to Wausau of the Youngers' claims on January 18, 2008, the claim was assigned to Liberty Mutual Senior Environmental Claim Specialist, Brian Merchant,[5] who has been with Liberty Mutual since 1987 and has been a Senior Environmental Claim Specialist since 1991.  Tr 191.

61.    Before assigning a liability adjuster to review liability, causation, and damages, Mr. Merchant determined whether the Policies provided any coverage for the Youngers'

---

[5]  Liberty Mutual owns Wausau. Tr 192.

claim.  Tr 207.

62.     After Mr. Ramer provided notice of the Youngers' claim to Wausau, he volunteered to provide Mr. Merchant with whatever information he could.  Mr. Merchant never requested any information.  Tr 173.

63.     Mr. Merchant set an initial reserve on the Youngers' claim and Wausau maintained the ability to change or adjust that reserve at any time.  Tr 197, 226-227.

64.     Mr. Merchant completed the Wausau coverage analysis shortly after he received the file - by February 14, 2008 - at which time he forwarded a coverage denial letter to IdleAire advising that there was no coverage for the Youngers' claims under the Policies because of the pollution exclusions:

> In view of the allegations of the subject-underlying claim and the terms of the above-referenced CGL policy, the CGL policy provides no coverage for the subject claim against IdleAire. The policy contains the pollution exclusion set forth above. Since the claimants' claims are on account of the damages allegedly caused by a release of carbon monoxide at the IdleAire facility, the pollution exclusion bars coverage for this claim.
>
> In addition, Wausau has no duty and, therefore, declines to defend IdleAire for this claim because no "suit" has been filed against IdleAire. In the absence of a suit against IdleAire, Wausau has no defense obligation under the CGL policy.
>
> Consequently, under the subject CGL policy, Wausau has no duty and, therefore, declines to defend IdleAire for this claim or to indemnify it for any settlement or judgment paid or incurred by it as a result.
>
> Tr 199; Ex 16, p 6.

65.    At the request of Mr. Ramer, Mr. Merchant reviewed Wausau's determination of "no coverage," but reaffirmed that determination by letter, dated April 14, 2008, in which he reiterated that coverage for the Youngers' claim was excluded by the pollution exclusions. Tr 204, 216.

66.    Due to Wausau's refusal to investigate or settle the Youngers' claim, IdleAire itself attempted to work with the Youngers' counsel to arrange a mediation in April 2008, but IdleAire's financial difficulties leading to these bankruptcy proceedings ultimately made the efforts unsuccessful. Tr 168-169, 180-181.

67.    Mr. Merchant declined to have any medical examinations performed on the. Youngers, declined to travel to Orlando, Florida to meet with Mrs. Younger, and declined to participate in mediation. Tr 169-170, 173.[6]

68.    In fact, both IdleAire and counsel for the Youngers offered Wausau the opportunity to conduct independent medical examinations of the Youngers[7] and to meet Nancy Younger, which Wausau declined because it had been determined that there was no coverage for the Youngers' claims under the Policies.  Tr 207-210.

---

[6]    Mr. Merchant stated that if a mediation occurred, Wausau might consider contributing some amount of money. Tr 197.

[7]    Mr. Younger had not yet died when Mr. Merchant received the file. Tr 208.

**D.**   **Facts Relating to Alleged Breaches**

69.   Mr. Ramer understood shortly after the Incident that Mrs. Younger had claimed

that she and her husband had almost been asphyxiated and died, and that Mr. Younger had

suffered a massive nosebleed, as a result of the Incident.  Tr 131-133.

70.   During the time period shortly after the Incident, Mr. Ramer was aware that any

claim or lawsuit arising from the Incident might result in negative publicity, such as by

suggesting to truck drivers that the IdleAire system posed a danger of exposure to carbon

monoxide.  Tr 134-135.

71.   At the time of the Incident, Mr. Ramer was aware that IdleAire was planning

to make an initial public offering for its common stock.  Tr 134-135.

72.   During a telephone conversation between Mrs. Younger and Mr. Badgett on

July 17, 2007, Mrs. Younger told Mr. Badgett that as a result of the Incident, the Youngers

suffered from an infusion of diesel fumes into their truck cab, had almost been asphyxiated

and died, were left disorientated and very ill, experienced acute headaches, experienced

burning in the eyes and throat and that Mr. Younger had suffered a massive nosebleed the

day before and had been taken to a hospital; Mr. Badgett told Mrs. Younger that IdleAire

wanted to reimburse the Youngers for their expenses arising out of the Incident.  Ex. 23

(Affidavit of Thomas Badgett) (May 21, 2009); Tr 71, 80-87.

73.   During a telephone conversation between Mrs. Younger and Mr. Badgett on

July 25, 2007, Mr. Badgett told Mrs. Younger that a metal flange connecting the service

module sleeve to the air conditioning unit above the parking space that the Youngers had used on July 11-12, 2007, pulled partially away, creating a gap through which fumes could enter the sleeve and be transmitted through the service module and into the cab of a truck connected to the IdleAire system. Ex. 22 (Younger Call Notes: "Post Incident IdleAire Conversations"); Ex. 23 (Affidavit of Thomas Badgett) (May 21, 2009); Tr 76, 88-89.

74.    During the telephone conversation between Mrs. Younger and Mr. Badgett on July 25, 2007, Mr. Badgett told Mrs. Younger that IdleAire should have discovered the loose flange as part of its routine inspection procedure but had failed to do so, that the IdleAire unit the Youngers had used was an older model unit that should have been removed from the market, that both the unit the Youngers had used and the neighboring unit had malfunctioned, that IdleAire was repairing or removing all models with similar problems, and that IdleAire had subsequently developed written engineering procedures for repair of units with similar problems. Ex. 22 (Younger Call Notes: "Post Incident IdleAire Conversations"); Ex. 23 (Affidavit of Thomas Badgett) (May 21, 2009); Tr 76-77, 89, 91-94.

75.    During the telephone conversation between Mrs. Younger and Mr. Badgett on July 25, 2007, Mr. Badgett again offered on behalf of IdleAire to reimburse the Youngers for any expenses arising out of the Incident. Ex. 22 (Younger Call Notes: "Post Incident IdleAire Conversations"); Ex. 23 (Affidavit of Thomas Badgett) (May 21, 2009); Tr 76-77, 91-93.

76.    By August 20, 2007, Mr. Ramer anticipated that the Incident could result in litigation, as he drafted a file memorandum concerning "the William and Nancy Younger

July 11th, 2007 complaint/incident," on which he included the heading "Attorney Work Product."   Tr 139-141; Ex. 83 (Memorandum to File by Claude Ramer) (Aug. 20, 2007). Mr. Ramer understood "attorney work product" to mean work product that is prepared when litigation is filed or litigation is anticipated.  Tr 139-140.

77.    In work task lists Mr. Ramer maintained, one listed under a heading titled "Incidents," a task stating "Bill and Nancy Younger: submit notice of loss to Liberty Mutual," which Mr. Ramer had set for completion by November 9, 2007.  Ex. 29 (Ramer Work Backlog, at No. 5(d)) (Nov. 5, 2007).  IdleAire's notice to Wausau continued to be listed on Mr. Ramer's task lists in late November, one of which listed the "YOUNGER INSURANCE CLAIM" as one of eighteen tasks to be completed.  Ex. 30 (Ramer November 28-29 To Do List); Tr 141-142.

78.    IdleAire did not submit any notice of the Incident to Wausau until January 18, 2008, more than six months after the Incident.  Ex. 49 (General Liability Loss Notice) (Jan. 17, 2008); Tr 195.

79.    IdleAire's engineering staff performed certain testing of the IdleAire HVAC system the Youngers used on July 11-12, 2007, but did not include the Youngers' truck in such testing and, according to IdleAire's engineering personnel, IdleAire's tests were incomplete and yielded uncertain results. Tr 98; Tr 100-106; Tr 77-79.

80.    IdleAire did not:

(a)    inspect or test the Youngers' truck promptly after the Incident or later and, thus, could not determine, for example, whether the Youngers' truck was leaky.  Tr 98; Tr 75, 77, 78; Tr 100; Tr 152.

(b)    inspect or test the truck parked next to the Youngers' truck.  Tr 98-99.

(c)    examine atmospheric conditions such as wind direction and wind speed at the time of the Incident.  Tr 99.

(d)    have an independent engineering expert(s) examine or test the IdleAire unit used by the Youngers.  Ex. 48 (E-mail from James H. Price to David Herman & Paul Boyd) (June 16, 2008).

(e)    retain a hose from the IdleAire unit the Youngers used on July 11-12, 2007 that reportedly contained a tear.  Tr 99.

81.    The Youngers continued to use their truck following the Incident and eventually parked it at their Florida home, where it remained outdoors and exposed to the elements for approximately one year before being garaged.  Tr 320-321.

82.    As of March 29, 2008, more than eight months after the Incident, IdleAire had not reconstructed the Incident for the purpose of measuring the amount of carbon monoxide and other contaminants that can accumulate in a truck cab of similar size over the period of time the Youngers claim to have been exposed to fumes, which would include attempting to locate the trucks parked closest to the HVAC unit servicing the Youngers' parking space and

23

obtaining meteorological data such as wind direction and speed over the same period.  Tr

147-148; Ex. 80 (E-mail from Claude Ramer to Michael Crabtree) (Feb. 20, 2008).

83.    As of August 26, 2008, more than thirteen months after the Incident, IdleAire

had not considered or analyzed whether defects in the Youngers' truck might admit fumes

from an adjacent truck.  Ex. 27 (E-mail from Claude Ramer to Regina Rizzi) (August 26,

2008).

84.    Wausau did not have an opportunity to conduct an investigation immediately

following the Incident because IdleAire did not provide notice of the Incident until six

months after the fact, which did not allow Wausau the opportunity to participate in early

investigations or settlement efforts.  Tr 243; Tr 205.

85.    When IdleAire sent to Wausau the Complaint the Youngers filed in the

Liability Action, there was a discussion of filing an answer, but Wausau never assigned

counsel and never actually filed the answer because Wausau had denied coverage. Tr 214,

216.

86.    Liberty Mutual Director of Coverage Kimberly Olson (A 3,18), who was Mr.

Merchant's successor in handling the Youngers' claim, did not second guess Mr. Merchant's

denial of coverage and decision not to assign a liability adjuster to investigate the claim

because she believed he had a reason for everything he did. Tr 263, 268.  Ms. Olson also

admitted that Wausau does not know if it was disadvantaged by receiving notice of the

Youngers' claim in January 2008, because Wausau never reviewed what evidence was still available at that time. Tr 250, 266-268.

87.    With respect to IdleAire's duty under the Policies to "[c]ooperate with [Wausau] in the investigation, settlement or defense of the claim or 'suit,'" Mr. Merchant agreed that IdleAire had little opportunity to comply with any portion of that provision because Wausau declined to investigate the Youngers' claim, refused to defend against that claim, and made no independent effort to settle that claim. Tr 210-212.

88.    According to general policies and procedures of Wausau, Mr. Merchant's determination of "no coverage" for the Youngers' claim foreclosed any need on the part of Wausau for information about the liability or damages aspects of their claim. Tr 211-215, 235.

89.     Although Albert McComas, Wausau's expert witness, testified that Wausau lost the opportunity to obtain contemporaneous access to liability and damage evidence due to the timing of IdleAire's notice of the Youngers' claim, he did not opine as to what Wausau would have done with that opportunity.

90.    According to Mr. Merchant and Ms. Olson, Wausau, in fact, would have done nothing differently had it been given that opportunity – *i.e.*, even if Mr. Merchant had received notice of the Youngers' claim immediately after the Incident occurred in July 2007, he would have made the same determination of "no coverage" based on the pollution exclusions and, as such, no liability adjuster would have been assigned to that claim, no

25

investigation of the claim would have been conducted and no defense or indemnity would have been provided to IdleAire. Tr 207, 210-214, 216, 219, 235.

91.    Ms. Olson testified that she accepted Mr. Merchant's conclusion that the "no coverage" determination would have been the same in 2007, and that she would not second guess the accompanying decision not to assign a liability adjuster.  Tr 263, 268.

92.    Once Wausau determined that no coverage existed for the Youngers' claim, Wausau's position was that it had no further obligations with respect to the claim and, thus, it had no interest in liability and damages information or evidence. Tr 207, 210-214, 216, 219, 235.

93.    It was the general policy and procedure of Wausau that a determination of coverage precede the assignment of a liability adjuster or a liability investigation. Wausau would have made the same determination of "no coverage" for the Youngers' claim pursuant to the pollution exclusions regardless of when notice of that claim was first provided.  Tr 207, 210-214, 216, 219, 235.

**Information Available to Wausau**

94.    The flange from the IdleAire unit in question had been preserved and was available for inspection by Wausau in January 2008, but Wausau declined any inspections. Tr  76, 171-172, 183.

95.    The employees from IdleAire's engineering department who had tested the IdleAire unit in question were still working at IdleAire and were available to Wausau in

January 2008, but Wausau declined to interview them.  Tr 76, 171-172, 183.

96.    Wausau could have re-created IdleAire's testing in January of 2008, but Wausau declined to do so.  Tr 76, 171-172, 183.

97.    The Youngers' medical  information and truck remained available for inspection by Wausau in January 2008, but Wausau declined offers from IdleAire and the Youngers' counsel to make them available to Wausau.  Tr 76, 171-172, 173, 183.

98.    The driver of the truck parked next to the Youngers on the night of the Incident was not an IdleAire customer and was not hooked up to an IdleAire unit; he left in the middle of the night and, accordingly, no one, including IdleAire, had any means of locating that driver at any time.  Tr 148.

## Wausau's Reserve

99    Upon receipt of notice from IdleAire of the Incident, Wausau set a reserve; however, because the reserve could be set only after Wausau first received notice and created a claim file, the reserve could not be promptly established after the Incident.  Tr 197, 210.

100.    Prompt notice is vital under liability policies because only an insurer can establish a case reserve. Tr 277.

101.    Reserve-setting is an essential component of the financial integrity of an insurance company, protects policyholders, and is very closely watched by insurance regulators.  Tr 244.

102.    Wausau could change its reserve on the file at any time. Tr 224. There was no testimony or evidence presented that Wausau's financial condition was impacted at any time or in any way by the timing or amount of the reserve set for the Youngers' claim.

103.    IdleAire did not have a formal document retention and destruction policy, including with respect to e-mails, at the time of the Incident, and individual IdleAire employees deleted e-mail messages on an *ad hoc* basis. Tr 122; Tr 63-64,70.

104.    IdleAire did not direct that documents concerning the Incident be retained before late February 2008. Tr 142-143; Ex. 34 (E-mail from Claude Ramer to James H. Price) (Feb. 29, 2008) (attaching draft memorandum dated Feb. 29, 2008); Ex. 26 (E-mail from Claude Ramer to James H. Price) (Feb. 20, 2008).

105.    Mr. Ramer's employment at IdleAire, Inc., the company formed following IdleAire Technologies Corporation's filing for bankruptcy protection, ended in October 2008, he did not advise any IdleAire, Inc. employees that a litigation hold had been implemented concerning the Youngers' claim against IdleAire Technologies Corporation, nor did Mr. Ramer take any steps to ensure his own computer would be maintained pursuant to the litigation hold. Tr 123.

### Missing Documents

106.    Documents concerning the Incident may be missing, including  e-mail messages to or from Mr. Ramer from the time of the Incident until November 9, 2007, and e-mail messages to or from Mr. Badgett from 2007, as reflected in an analysis of a copy of

28

the IdleAire hard drive in the possession of the IdleAire bankruptcy trustee.  Ex. 50 (Forensic

Analysis Report, Section 3.1) (Oct. 19, 2009).

107.    Mr. Badgett did not retain the notes he took of weekly managers meetings,

including meetings in which the Incident was discussed.  Tr 72-74.

108.    While Brian Merchant, a senior environmental claims adjuster for Wausau, was

evaluating coverage, he asked IdleAire to keep Wausau informed of any activity and noted

that, if a mediation took place before a coverage determination was complete, he would ask

for possible liability adjuster assignment.  Ex. 4 (Wausau Claim Remark #3) (Jan. 24, 2008);

Tr 198-199.

109.    Wausau issued its coverage position letter concerning the Incident on February

14, 2008, in which Wausau explicitly reserved its rights to deny coverage "[t]o the extent that

an insured failed to notify Wausau of an occurrence, accident, suit and/or claim as required

by the Wausau policy, or otherwise failed to comply with all of the provisions (including

conditions) and other prerequisites to coverage thereunder," as well as "for costs and expense

or other obligations assumed by any insured without notice to and the consent of Wausau";

at the time Wausau issued the letter, Wausau had limited information about the Incident and

was not sure what further information would be discovered.  Ex. 16 (Letter from Brian

Merchant of Wausau to Claude Ramer of IdleAire) (Feb. 14, 2008); Tr 200-201.

110.    Despite disclaiming coverage for the Youngers' claim arising out of the

Incident, Wausau expressed to IdleAire its willingness to consider contributing to a

settlement to resolve the Youngers' demands.  Ex. 9 (Wausau Claim Remark #37); Ex. 80

(E-mail from Claude Ramer to Michael C. Crabtree, Lynn Youngs and James H. Price) (Mar.

29, 2008); Tr 147, (Testimony of Claude Ramer); Tr 231.

111.   Even when Wausau denies coverage, it often nonetheless considers

participating in the settlement of the underlying claim in what it terms a "compromise settle."

Tr 244.

112.   It is important for an insurer to be able to conduct a prompt evaluation of an

occurrence before the recollections of the witnesses, physical evidence and other critical

information begin to dissipate.  It is important for an insurer to be able to determine what

steps should immediately be taken after an occurrence.   It is vital to obtain recollections of

witnesses and parties to the occurrence as quickly as possible, simply because memories

necessarily fade over time.  Tr 311-314.

### Mr. Ramer's Assistance

113.   Mr. Ramer proposed and drafted a non-disclosure agreement to allow IdleAire

to provide confidential information to the Youngers, and he signed it along with counsel for

the Youngers.  *See* Ex. 42 (Facsimile Transmittal Sheet from Claude Ramer to Don Russo)

(Mar. 31, 2008); Ex. 43 (Mutual Non-disclosure Agreement) (Apr. 1, 200[8]); Tr 153.

114.   Mr. Ramer, after the termination of his employment with IdleAire, assisted the

Youngers in this matter reviewing IdleAire documents for Mr. Russo in Knoxville,

Tennessee; Mr. Ramer billed Mr. Russo for that work on an hourly basis, and Mr. Russo paid

Mr. Ramer for that work.  Tr 184-185.

115.    In May 2009, Mr. Ramer, following an exchange of e-mail messages with Mr. Badgett, served as the primary drafter of an affidavit of Mr. Badgett concerning his contacts with Mrs. Younger following the Incident.  He did so in response to a request by Mr. Russo, who advised Mr. Ramer that he believed Mr. Badgett's statements to Mrs. Younger following the Incident evidenced absolute liability on the part of IdleAire, and doing so while aware of the remaining coverage issues in the instant action.  Tr 155-156; Ex. 23 (Affidavit of Thomas Badgett) (May 21, 2009).

116.    The Badgett Affidavit states, *inter alia*, that "I explained that the flange that connected the service module sleeve to the air conditioning unit above [the Youngers'] parking space had pulled partially away from the unit, thereby creating a gap through which fumes could enter the sleeve and be transmitted through the service module and into the cab or a truck connected to the system," that "[t]he flange involved was one of the few original flanges in our equipment that had not been replaced by a newer design," and that "I assured [Mrs. Younger] that the combination of circumstances that had led to her Incident were unique, that other flanges of this type were being examined and that she should not be concerned about the safety of other drivers," which statements relate to the potential liability of IdleAire for the Youngers' claims.  Ex. 23 (Affidavit of Thomas Badgett) (May 21, 2009).

117.    In mid-2009, during discovery in this proceeding, Mr. Ramer traveled to the bankruptcy trustee's office in New Jersey and, based on his knowledge of IdleAire's files,

assisted in the identification of IdleAire documents held by the IdleAire trustee, doing so on behalf of Mr. Russo; Mr. Ramer requested reimbursement from Mr. Russo for the time involved in that trip, which Mr. Russo paid.  Tr 156-157.

### Additional Facts Regarding Policies' Notice Clauses

118.    Liability insurance policy notice-of-occurrence provisions are intended to ensure that the insurance company has the earliest possible notice of any circumstances that may result in a claim, which ensures that the insurance company's personnel, who have special expertise in evaluating possible occurrences and are trained to have that expertise, have the opportunity to determine what steps need to be taken shortly after an occurrence has taken place.  The earlier an insurer has an opportunity to evaluate a claim or an occurrence and determine what steps should be taken while the facts, recollections of witnesses, and other evidence are still fresh, the better the quality of the evaluation and possible investigation.  Tr 276-277.

119.    Prompt notice allows for an investigation before recollections fade and before evidence is lost or possibly modified in any way. A reconstruction of an occurrence after the fact may not accurately represent in all circumstances what actually occurred because evidence dissipates over time.  Tr 277-278.

120.    It is important for an insurer to be able to conduct a prompt evaluation of an occurrence before the recollections of the witnesses, physical evidence and other critical information begin to dissipate.  It is important for an insurer to be able to determine what

steps should immediately be taken after an occurrence. It is important to obtain recollections

of witnesses and parties to the occurrence as quickly as possible, simply because memories

necessarily fade over time. Tr 311-314.

**IdleAire Did Not Ascertain The Youngers'
Medical Conditions Following The Incident**

121.    Neither Mr. Ramer nor Mr. Badgett met in person with Mr. or Mrs. Younger in the

months following the Incident to observe their physical state.   Tr 134; Tr 71.

122.    IdleAire did not request or conduct an independent medical examination of Mr.

Younger or Mrs. Younger immediately following the Incident, or at any time up to at least February

2008.  Tr 75, 142-143; Ex. 26 (E-mail from Claude Ramer to James H. Price) (Feb. 20, 2008).

**CONCLUSIONS OF LAW**

**IdleAire's Notice was Not Untimely**[8]

A.    With the issuance of the Tennessee Supreme Court's decisions in *Alcazar v.*

*Hayes*, 982 S.W. 2d 845 (Tenn. 1998), and *American Justice Ins. Reciprocal v. Hutchison,*

15 S.W.3d 811, 818 (Tenn. 2000), the focus in cases involving insurers' assertions of late

notice of claims shifted from examining whether or not the notice was timely under the

circumstances to examine whether the insurer was prejudiced by the timing of its receipt of

notice.  *See, e.g., Anthony v. Long,*   2000 WL 115981 (Tenn. Ct. App. 2000)(*Alcazar*

introduced a new approach for Tennessee law analysis of insurers' late notice defenses);

---

[8]        Both parties agree, and the Court concurs,  that the law under which this Court must
evaluate the substantive issues is the law of Tennessee.  IdleAire's principal place of business was
in Tennessee, the Youngers lived in Tennessee and the Incident happened in Tennessee. *See*
*Northfield Ins. Co. v. Mariner Post Acute Network, Inc.*, 300 B.R. 610, 613 (Bankr.D.Del. 2003).

Tenn. Automobile Liab. Ins. § 6:4 ("With the issuance of the *Alcazar* opinion, ...the Tennessee Supreme Court has altered the analysis [of insurer defenses based on claimed late notice], preferring to focus on proof of prejudice with a presumption thereof arising when the insured fails to give notice").

B.    Earlier Tennessee law had focused on the threshold issue of whether the notice given by the insured was such as to afford the insurer a late notice defense, specifically whether the insured was aware of facts which would suggest to a reasonably prudent person that the event for which coverage is sought might reasonably be expected to produce a claim against the insurer. *Reliance Ins. Co. v. Athena Cablevision Corp.*, 560 S.W.2d 617, 618 (Tenn. 1977). "[W]hat may be a reasonable time in one situation and under one condition, relating to giving notice, may or may not be under different circumstances, such that each case must rest upon the person and upon the facts and all of the surrounding circumstances in a given situation" *Munal Clinic v. Applegate,* 273 S.W.2d 712, 715 (Tenn. App. 1954). "[W]here there is doubt as to whether or not notice and proof of loss are given within a reasonable time the issue should be resolved in favor of the insured and not the insurance company." *Henderson v. New York Life Ins. Co.*, 250 S.W.2d 11 (Tenn. 1952). "The requirement of a liability policy that notice shall be given on the occurrence of an accident does not require notice of an accidental occurrence where no bodily injury is apparent at the time of the accident, and there is no reasonable ground for believing that a claim for damages will be made, and the duty to give notice does not arise until the subsequent facts would

suggest to a reasonably prudent person that a liability might arise." *Munal Clinic*, 273 S.W.2d

at 715-716 (eight month delay acceptable in reporting medical treatment that later gave rise

to claim where "there was no reasonable ground for complainant to believe that a claim for

damages would arise").

C.     In *Nationwide Mut. Ins. Co. v. Shannon*, 701 S.W.2d 615 (Tenn. App. 1985),

the court expressly approved the statement in *Munal Clinic* that:

> "Generally, delay is excusable in the case of an accident which is trivial and
> results in no apparent harm, or which furnishes no ground for insured, acting
> as a reasonable and prudent man, to believe at the time that a claim for
> damages will arise or that the injury is one insured against. In such case notice
> is not required until some claim within the coverage of the policy has been
> presented or is reasonably to be anticipated, in which event the requirement as
> to notice is satisfied if notice is given within a reasonable time after the
> situation assumes an aspect suggestive of a possible claim for damages."

701 S.W.2d at 619, *quoting Munal Clinic*, 273 S.W.2d at 715.

D.     The *Nationwide* court went on to add a refinement that the court believed was

more applicable to the facts before it (a rear-end motor vehicle accident):

> "Clearly, notice is necessary when there has been such an occurrence as would
> lead a reasonable and prudent man to believe that it might give rise to a claim
> for damages.  In this connection the test is not a subjective one measured
> merely by the good faith of insured, but is an objective one, and hence the
> mere fact that insured believes that an injury resulting from an accident is
> slight, or that he does not believe that any valid claim will arise out of an
> accident, is not of itself an excuse for failure to give notice of the accident to
> insurer."

701 S.W.2d at 620.

E.     The circumstances in this proceeding were such that a reasonable and prudent

person in IdleAire's position would not have believed prior to January 2008 that the

Youngers would make a claim because there was no serious or long term injury known at that time, but merely passing, minor ailments which could not objectively be expected to give rise to a claim or lawsuit.

F.    Given the facts of this case, IdleAire's notice was not untimely under Tennessee law. Moreover, and as discussed *infra*, the Tennessee Supreme Court's decisions in *Alcazar* and *Hutchison,* have shifted the focus in cases of claimed untimely notice to the issue of prejudice, which does not exist in this case.

### No Prejudice Resulted From the Timing of IdleAire's Notice of Claim

G.    Under Tennessee law, "there is a presumption of prejudice if an insurer receives late notice of a claim, but "the  insured may rebut this presumption by proffering competent evidence establishing that the insurer was not prejudiced by the insured's delay." *See American Justice Ins. Reciprocal v. Hutchison,* 15 S.W.3d 811, 818 (Tenn. 2000), citing *Alcazar v. Hayes*, 982 S.W.2d 845 (Tenn. 1998); *see also* 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 13.26 (2009).  In *Alcazar*, the Tennessee Supreme Court delineated three policy reasons for adopting the notice-prejudice rule: "(1) the adhesive nature of insurance contracts; (2) the public policy objective of compensating tort victims; and (3) the inequity of the insurer receiving a windfall due to a technicality." *Alcazar,* 982 S.W 2d at 850. The Court made a point of noting that "the public policy of this State has long promoted the notion that victims of torts should recover compensation for their injuries", and that "it is inequitable for an insurer that has not been prejudiced by a delay in notice to reap the benefits

flowing from the forfeiture of the insurance policy; ... this State's public policy disfavors the ability of an insurer to escape its contractual duties due to a technicality."  982 S.W.2d at 852.

H.    The prejudice Wausau claims, after the fact, is that it was not able to conduct a contemporaneous investigation of the Incident and the Youngers' then-physical conditions and could not set reserves earlier.  The testimony of Wausau's Ms. Olsen, however, established that Wausau had no evidence that its ability to investigate was prejudiced by receipt of notice in January of 2008 because Wausau did not review what evidence was still available at that time, despite offers from IdleAire and from the Youngers.  The testimony of Mr. Merchant established that reserves can be changed throughout a case, and there was no evidence that Wausau was affected in any way or at any time by the timing or amount of the reserve set for the Youngers' claim.

I.    The evidence showed, however, that even if Wausau had received notice of the Youngers' claim immediately after the Incident occurred in July 2007, Wausau would have handled that claim in the exact same manner it was handled in January 2008 – *i.e.,* it would have made a determination that no coverage existed under the Policies due to the pollution exclusions and, as a result, would not have assigned a liability adjuster to the claim, would not have investigated liability, causation and/or damages under the claim, and would not have provided IdleAire with a defense or indemnity.

J.     In *Smith & Nephew, Inc. v. Federal Ins. Co.*, 2005 WL 3134053, *5 (W.D. Tenn. 2005), the court (interpreting Tennessee law) found that no prejudice exists when the timing of the insured's notice of a claim would not have altered the insurer's handling of that claim:

> [The insured] Smith and Nephew ... asserts that [the insurer] Federal's conduct upon notice of the *Reid* litigation conclusively rebuts the presumption that it suffered prejudice as a result of the failure to comply with the notice provisions of the insurance contract. Because Federal maintained that it had no duty to defend or indemnify the Plaintiff on the basis of the allegations set forth in both the original and amended complaints, Smith and Nephew maintains that the insurer would not have defended the suit even upon timely notice. Thus, according to the Plaintiff, Federal cannot claim to have suffered prejudice in its ability to investigate, defend or settle because of late notice of a suit for which it never would have provided coverage.

K.     Further, as in *Smith & Nephew*, the evidence at trial showed that all material evidence was available to Wausau in January of 2008 when it received notice of the claim. The HVAC unit was still available; the actual flange from the unit was available; the IdleAire engineering employees who had tested the unit were available (as were their photographs and report); Mr. Ramer and Mr. Badgett, who ordered the engineering investigation, were available; and the Youngers' truck was available. The Youngers' medical information was also available and, notably, the more recent medical information was of even greater useful, as the Youngers' serious, long term injuries were delayed due to the nature and mechanism of carbon monoxide injuries.

L.     By producing competent evidence at trial that all of the key items of evidence were available for Wausau's examination when it received notice of the Youngers' claim in

January of 2008, the Youngers rebutted the presumption that Wausau was prejudiced by the timing of its receipt of notice of the Youngers' claim.

M.      Because the Youngers' alleged medical symptoms and claims of carbon monoxide poisoning did not arise until many months after the Incident, Wausau lost nothing by not having an independent medical examination performed immediately after the Incident.

N.      Wausau could not have suffered prejudice from the lack of an early medical examination since its representative's testimony established that Wausau would not have requested such an examination even if it had received early notice of the Youngers' claim.

O.      Similarly, Wausau could not have suffered prejudice by virtue of not setting a reserve on the Youngers' claim prior to January 2008 because it denied the claim in its entirety on the basis that the Policies did not provide coverage.

P.      In addition, IdleAire did nothing to prejudice Wausau's ability to adjust or change its initial reserve setting as Wausau saw fit.

### IdleAire Did Not Breach the Policies' Cooperation Clauses or Prejudice Wausau

Q.      Under Tennessee law, breach of a cooperation clause in an insurance policy is established by a showing that actions or inactions on the part of an insured "more likely than not seriously interfere[d] with ... [its] investigation of the claim or defense of the action." *State Auto Ins. Co. v. Bishop*, 2000 WL 279940, *7 (Tenn. App. 2000)(quoting *Thaxton v. Allstate Ins. Co.,* 1988 WL 23922, *2 (Tenn. App.1988)).

R.     In order for an insurer to successfully assert a non-cooperation defense, "the insured's lack of cooperation must be substantial and material to result in a breach of a policy condition." *Allstate Ins. Co. v. Auto Owners Ins. Co., Inc.*, 1998 WL 102075 (Tenn. App. 1998).

S.     As with defenses based on notice provisions in insurance policies, a rebuttable presumption of prejudice exists with respect to a claimed breach of a cooperation clause. *Talley v. State Farm Fire and Cas. Co.*, 223 F.3d 323 (6th Cir. 2000)(projecting what the Tennessee courts would do based on *Alcazar* and *Hutchison*, and subsequent Tennessee intermediate appellate court decisions extending the prejudice requirement). *See also Anthony v. Long,* 2000 WL 115981 (Tenn. Ct. App., 2000)(extending *Alcazar* prejudice requirement to notice of suit issues). [9]

T.     Here, IdleAire could not fail to "[c]ooperate with [Wausau] in the investigation, settlement or defense of the [Youngers'] claim or 'suit'" because, as a result of Wausau's initial determination (through Mr. Merchant) that no coverage existed under the Policies due to the pollution exclusions, Wausau never engaged in any investigation, settlement or defense of the Youngers' claims with which IdleAire could have cooperated.

---

[9]     In its closing, Wausau cited the case *Gaston v. Tennessee Farmers Mut. Ins. Co*., 120 S.W.3d 815 (Tenn. 2003), for the proposition that the *Alcazar* prejudice analysis does not apply to a breach of a cooperation clause. *Gaston,* however, dealt not with a cooperation clause, but with a provision in an uninsured motorist (UM) policy which stated that no UM coverage would be provided if the injured person settled the bodily injury claim without written consent.  The *Gaston* decision merely indicated that the issue of prejudice did not arise in that context.

U.    In addition, no prejudice arose from IdleAire's alleged breaches of the cooperation clause for the same reasons that the timing of receipt of notice of the Youngers' claim did not prejudice Wausau – *i.e.*, Wausau would have performed the exact same claims-handling activities and would have reached the exact same "no coverage" determination pursuant to the Policies' pollution exclusions resulting in no investigation, settlement or defense of the claim, despite IdleAire's and the Youngers' efforts to encourage an investigation.

V.    Wausau's claim that Mr. Ramer cooperated with the Youngers during the pendency of the adversary proceeding and thereby violated the provisions of the Policies is not supported by the evidence.  The bankruptcy made document location very difficult.  Mr. Ramer attempted to locate IdleAire's documents more efficiently.  The documents were then made available to both parties in the adversary proceeding.

W.    Wausau's assertion that it is entitled to a negative presumption that e-mails were deleted from Mr. Ramer's computer must be denied because there is no evidence in the record upon which the Court can conclude that the deletions were a deliberate act or that any such e-mails would have been helpful to Wausau.

### IdleAire Did Not Make or Offer to Make Any
### Voluntary Payments in Violation of the Policies

X.    The Policies state that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."

41

Y.     According to Tennessee law, "[i]t is the Court's duty to enforce contracts according to their plain terms." *Alcazar,* 982 S.W.2d at 848 (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.,* 521 S.W.2d 578, 580 (Tenn.1975).

Z.     Wausau produced no evidence that IdleAire ever made any payments to the Youngers, which is a condition required to trigger forfeiture under this provision.

AA.     Moreover, even if IdleAire had paid the Youngers' initial medical bills (which it undisputedly did not do), it offered to do so at its own expense, which is permitted under the plain language of the Policies.

BB.     IdleAire's placing Wausau on notice once it became clear that a claim likely would be made by the Youngers does not constitute a claim for reimbursement of expenses that IdleAire never actually paid.

## CONCLUSION

The Court is persuaded that IdleAire could have provided earlier notice to Wausau and, in hindsight, earlier notice would have eliminated delay in addressing the merits of the Youngers' claims. Still, despite IdleAire's actions or inactions, the Court has concluded that IdleAire had a reasonable basis to believe that the Youngers' ills were minor and had subsided. Ultimately, the Court is fully satisfied that Wausau was not prejudiced because it was determined to decline coverage on the basis of the pollution exclusion.

In addition, all of the necessary evidence remains available to enable Wausau to mount a defense in the Liability Action. There are medical records of the Youngers, physical evidence and witnesses. Lastly, Wausau will be able to ascertain the accuracy and/or truthfulness of statements that IdleAire representatives made to the Youngers. All of this means there is no prejudice to Wausau and, therefore, Tennessee law mandates judgment in favor of the defendants. Order to follow.


Dated: February 17, 2010

KEVIN GROSS, U.S.B.J.